Next case is number 5, 16-0104, in re Marriage of Key. Counsel for the Appellant, you may proceed. May it please the Court. A date of the aggregator for the Respondent Appellant, Daniel Key. This case stems from a petition to modify child support that was filed 11 years ago. This specific appeal stems from that. It was filed in August of 2016, post-divorce. The mother filed a petition to modify the father's child support obligation in August of 2016 in Franklin County, and the father immediately that same month, within a week and a half, filed a motion to transfer venue to St. Clair County because at that point in time the mother lived in St. Clair County and the father lived in the state of Wisconsin. The case sat dormant between August of 2016. The only order that was filed in Franklin County after that was in December of 2010. And in December of 2010, the parties entered into an agreed order in Franklin County in which they agreed that the mother would have leave to remove and take the child to the state of Atlanta, or the city of Atlanta in Georgia, and which she did for a period of 5 months in early 2011. Again, the case sat dormant between December of 2010, and up until the time the mother sought to transfer venue of the case pursuant to the father's petition that had been filed 6 1⁄2 years earlier in August of 2006. She then transferred the case to the county of St. Clair. This case was tried in late 2014 over the course of a couple of court dates, and ultimately the trial court modified the child support going all the way back to 2006. And that's where we're at. The first two issues I'd like to address, lumped together at this point in time, and the first is abandonment of pleadings and disposing of the petition to modify child support based on the 2010 order. One thing is clear, and that is the testimony of her attorney that had filed the petition to modify the child support in August of 2006 specifically stated that he did not draft the agreed order granting the leave to remove to the city of Atlanta in December of 2010, and that he may have reviewed it. He took no part in that. The first contention that I have is that it was abandoned because the mother failed to set her petition to modify child support for such long periods of time. And in conjunction with that, and I cited a couple of cases in the brief that I'm not going to belabor going into at this point, but in conjunction with that, looking at the December of 2010 order, I think that's the key to all of this. The December of 2010 order was not drafted by the same attorney who had filed the petition to modify on her behalf four and a half years earlier, in August of 2006, and he indicated he took no part in the drafting of it, and he might have reviewed it. He did not file it, and that's where the beginning and the end of what his involvement was. If she believed that her petition to modify child support was still active and viable in December of 2010, first of all, he was the attorney of record in the case, and he would have been involved in the granting of the order of leave to remove. And secondly, he would have been more than he would have actually filed the order with the court and got the setting, et cetera, et cetera. It was an agreed order at that point in time. And then the third point is Daniel Keith believed that that case had been disposed of or he would not have agreed to enter an agreed order in Franklin County because recall that he had filed his motion to transfer a venue to St. Clair County in August of 2006, four and a half years earlier. He had no reason to believe that that case was still active. And then I've got a couple of cases that I cite in the brief with respect to the issue of when an order disposes of all pending issues at that point in time. And so we're standing on our argument that it was abandoned and that December of 2010 actually disposed of any orders and issues pending, including four and a half years earlier than the mother's petition to modify child support that had been filed. We go back forward to February of 2013. The mother then, at that point in time, transfers the case to St. Clair County. And she does so ex parte, letting the father know after the fact that the case has been transferred here. There were a number of issues with regard to discovery that resulted in delay, which are all detailed in the court transcripts and records. But one of the things I want to focus on is the judge's ultimate conclusions with regard to not being able to determine the net income of Mr. King. He is an attorney by profession and a magistrate judge up in the state of Wisconsin. And the issue was, as a self-employed individual, what was his income for purposes of child support? Because, of course, at that point in time, the standard was with one child, 20% of his net income. We went through and provided not just his bank records, but an exhibit, which summarized all of those bank records in the form of Exhibit K. And Exhibit K is the key to calculating what his net income is. It is a summary and a listing, line by line, check by check, of every single check that he wrote out of his account, month by month, between the time that he opened his practice in 2009 and up until the time that his child support terminated in December of 2014 when the child moved in with Dad. And Exhibit K lists check numbers, dates, and a coding that I included as an attachment to the exhibit called court costs, which lists, for purposes of deduction, things that he paid out in the way of filing fees, surface of process fees, newspaper publication costs, etc., etc. And we went through and excruciated detail and put that before the court. Now, the court stated then in its ultimate ruling that I cannot determine what his net income is. And the cases that she cited dealt with the issue of I can't figure out how much money is coming in or I think you're not working hard enough to generate income. That was never the case in this particular case because we stipulated at the very outset, between the parties, we stipulated that his bank deposits were his gross receipts. All of the amount of money that he deposited into his bank account, we added those up. In fact, those numbers were provided by the mother in this case, and we used those as the starting point for all of this. One of the issues that was continuously asked of him on the stand was, how does this flesh with your tax returns? The only purpose of the tax returns is to determine the Schedule C deductions for purposes of calculating what is net income. But he didn't list any of his court costs and other law-related expenses out of pocket like surface of process fees and copies of records. He didn't deduct any of that on Schedule C. He halved, I don't know what he did, with respect to deducting it off to calculate his gross receipts on his tax return, but we don't care. And we don't care because we're using something better than the gross receipts on the tax return. We're using actual bank deposits, which was significantly higher than his gross receipts listed. So between the deductions, if you're starting off with the bank deposits, you have better than what you need for purposes of the tax returns. And then you use the Schedule C deductions plus the deductions that he didn't include, the court costs from Exhibit K, to accurately calculate what is net income. We provided this in great detail to the trial judge before she made her findings, and she said she could not calculate what his net income was. And I submit that the court should have been able to calculate what his net income was from all of the detail that we presented between the bank statements, which backed up everything, line by line, number by number, check number by number, date by date, on the Schedule K, all corresponded with the bank deposits, with the bank accounts. So between the two, you can calculate what his net income was. If she didn't believe that a deduction was proper, then she could have discluded that or not allowed that deduction, but she didn't do that. She decided to simply say, I cannot figure out what your net income is, and therefore I'm going to assess support based on whatever I think the reasonable needs of the child are. Now, just briefly on reasonable needs, part of the problem is she used 2007 income for purposes of calculating 2006, and 2007 income included an amount of money that he received in the way of leave, pay, and sick days from his Illinois State Police work, which is another problem, and she amortized that back for the four months in 2006, which she also should not have done. For purposes of his Illinois State Police work, we presented an exhibit, and I don't have the number in front of me, but it is in my brief. We presented an exhibit that showed that he last worked for the Illinois State Police in July 2000, six years before she even filed her petition to modify support. The leave and sick pay, and I cite a couple of cases in my brief, is the same as a bank account. He could have cashed this money in any time that he wanted to. It's not an increase, it's not a gain in income, it's simply money sitting there that he was entitled to receive from work that he had done up until July of 2000, and it had nothing to do with money that he earned in 2007, which is when he actually cashed it in, and it shows up on his tax return. So with respect to that, we're also asking for a reversal on the determination of that 20-some thousand dollars of leave and sick pay that he received from the Illinois State Police. Using that income, though, however, the court then backdated it to 2006 for the four months, using the same level of income that he received. He was working at the same law firm up in Iowa at the point in time in 2006 and 2007, and because she had filed in August of 2006, the judge backdated that to all the way to August of 2006. So as a minimum, those four months should not have been included, but as an addition, none of it should have been included because of the use of the Illinois State Police leave and sick pay. With regard to the calculation of his net income as a self-employed attorney, he started in 2009. Up until that point in time, he had W-2 income, and the court, in a petition or a motion to reconsider, actually changed that and modified it so that the court did use his W-2 pay for 2007, 2008, and 2009 up until the point in time when he started becoming self-employed as an attorney. So with respect to, however, the issue of retroactivity, there's another issue that I want to address. Because the mother sat on this case for six and a half years before she moved it from Franklin County to St. Clair County, because of that, we're asking that no retroactivity be attributed, regardless of what the dollar amount is that's calculated for current child support and made retroactive, simply because the mother could have set this case much earlier. And for the same reasons that I'm arguing that it was abandoned and that the 2010, December 2010 order disposed of everything, for those same reasons I'm arguing there shouldn't be retroactivity prior to the time that she moved it, because the father had every expectation that this had been disposed of in the 2010 order or had every expectation that because she hadn't done anything with the petition for six and a half years and she's the one living down here in St. Clair County and he lives up in Wisconsin, that it should not be attributed, no delay should be attributed to him. Now, with regard to what happened after that, there were discovery problems associated with it, and I do want to touch on that just briefly. Ultimately, the father provided every document that they requested in the way of discovery. And yes, he did have some trouble copying certain documents. When I came into the case in fall of 2013, one of the first things we did is he provided all of the bank account statements all the way back to 2006. The court had originally ordered that he had to provide the first bank account statement since they moved it in February of 2013, and then later on he provided everything going all the way back that was available. Another issue that the court didn't address was having to do with what deductions he might be entitled to with regard to VA disability pay that he received. However, she didn't address any of that because she just simply assimilated his income for purposes of 2009 to 2014. With regard to the petition, the equity in this case is that a petitioner should not be allowed to file a petition to modify in the hopes that eventually that there will be an increase in child support. If you look at the amount of money that he was making at the time of filing the petition in 2006 when she first filed in August of 2006, it actually would have resulted in a reduction in child support. His child support at that point in time was $480 a month, and his net income in 2006 would have resulted in about $390 a month in child support. The mother sat on this case and waited and waited until he started becoming self-employed and started making more money as a justification for then moving the case from Franklin County to St. Clair County. And I submit that she should not necessarily be rewarded, especially with regard to the issue of retroactivity prior to moving the case to St. Clair County, that she should not be rewarded for doing so. The only action taken by the mother between the time of the filing of the petition in August of 2006 and until she signed the order in December of 2010 and moved the case to St. Clair County in 2013, the only action she took was to try to get some pay information from him. Counsel, you will have an opportunity for a vote. Thank you. May it please the Court? My name is Susan Wilson. I represent the appellee, Lori Key, in this matter. I feel like, well, first of all, I'd like to start out with the standard of review. Appellant did not mention that in his brief, and I think it's very necessary to point that out at this point. The standard of review is abuse of discretion. No reasonable person would agree with this ruling of the Court. I think that the Court, in this matter, has a much easier burden, I don't think, after looking at the totality of the circumstances, looking at the facts, looking at the total disregard, the contemptuous disregard of this man for the Court, than any reasonable person could disagree. The reason I feel that is you have to look at the history. This matter started in 2006. Well, it is an unusually long time. So how is that not an abuse of discretion to go all the way back that far? I want to address that specifically. First of all, you will know in the record that this is a modification request of a 2003 modification. They got divorced in 98, and then in 2003 there was a modification. That order, that modification order in 2003, was based on the needs of the child. That was a default order. This man, who was an officer of the Court, who was an attorney, who later on became a magistrate judge. Was that through public aid? Pardon? Was that through public aid by the State? The 2003, I believe, was through the State. I know that John Altman became her attorney in 2006. I don't believe he represented her in 2003, but it's possible. But he was involved in the original force, I know, and I know he was involved in 2003, or in 2006. In 2003, Mr. Key did not appear. Mr. Key did not provide one piece of documentation of his income. Mr. Key did not participate in any way in the proceedings in 2003, prompting what became the default order. The default order, because he did not provide any information whatsoever. This is a man who's an attorney. This is a man who has a duty to at least respect the Court, didn't show up, didn't do anything. Until the Court entered a default order, then he filed a request to have it set aside, and the Court found no reason whatsoever to set that order aside. Fast forward to 2006. We now have an order in 2003 based on the needs of a child because he did not participate in any way. And this is all in Franklin County? It's all in Franklin County. In 2006, this is filed. And with regard to the delay from that point on, if you look at the record, it's clear that 99% of the fault of getting this to trial lies with Mr. Key. He refused to, and even though they say it sat there for three years, or for six years, from 2006 to 2009, there were no less than probably nine different orders entered by HFS with regard to child support issues, with regard to requests for documentation, with regard to trying to bring this matter to Court and get the documentation to find out what's going on. There's nine different orders and several requests going on at this time. He stayed up in Wisconsin and didn't do a thing. And with regard to that, my client testified. She continued after 2009 until the matter was transferred to St. Clair County. She continued to do what she could to no avail. This man refused to participate. He refused to respond to HFS. He refused to respond to John Alleman. He refused to respond to the Court. He sat there after filing his motion to transfer and not calling it up. He sat there and did nothing. And while my client is actively trying to get something done, there was a period from 2009 to approximately 2012 when there's not much activity that we could come up with in the court file, and the Court said in its ruling that if it found the support from 2006 to 2009, if it assessed support during that time, the Court said between 2009 and 2012, I'm not going to assess any child support in this period of time because I can't find a lot of activity. Therefore, if you want to suggest that the delay was a prejudice to him, it actually wasn't because during those three years of time, the Court did not assess any child support against him. Fast forward then to 2012 when it was transferred up here. I was involved. The County Court was involved. There were more than one attorney involved before Mr. Gruninger. We fought petition, contempt petition, motion to compel, another request for supplemental discovery. We fought for two years. Two weeks before the trial started, I want to say March 11, 2015, I think it started about March 23, after all of these attempts to find something from this man who's an attorney, who's a part-time judge, he tells the Court, I have one account. I have a bank account for my business. Everything goes through that. On March 11, he's told the Court, I don't have any other documents other than this one account. We start trial March 23, I believe, in 2015. For the first time in that all those year period, he admits to the Court, yes, I do have some other accounts. I have a personal account. I have another business account. I have a PayPal account. I have an IOTA account. There's three or four or five bank accounts that he has not even disclosed yet, all the while saying on March 11, I've given everything. They say, oh, he gave every document. He gave nothing other than information about one bank account. He states on that bank account, everything went through that bank account. It's his business account. And we're saying, how could you do that? How could you run your personal stuff? How could you do all this? Turns out he wasn't. So then we start the trial, and the Court's asking him about this motion to transfer. And he says, oh, I was bamboozled. And I quote that in my brief. I was bamboozled by this. I had no idea that anything was up here. I had no idea that this had been transferred up here under cross-examination from me. He admitted to the Court, not only was he not bamboozled, he had received all the documentation about the transfer three times from me. He called me. I don't have it. I sent it. He called me again. I called him. I contacted him. I don't have it. Three times he said, I don't have it. I sent it to him. In the trial, on the first day, he admits to the Court, yeah, I did get it three times before that. And yet he sits back, and again, the Court has a lot of discretion because they're the ones that see the demeanor of the person. They're the ones that judge the credibility of the person. They're the ones that actually see what's going on and judge all these things. This man leaned back in his chair, acted like he had no duty whatsoever to participate. He was bamboozled. He was all these things. He had total contemptuous disregard for any respect for the Court. A man of what I think should have a higher respect had none. He presented. We had seven days of trial over between March and December. Each day of trial, if you look at the transcript, and his attorney was very good about trying to bring forth information as we discovered that was there and we hadn't gotten it before. Each day of the trial, we have a different interpretation by Mr. Key of what his income is. The very first day, he says, look at my tax returns. Look at my tax returns. They're obvious. Look at my tax returns. I've shown you all my tax returns. And I said, well, do you have any receipts for these expenditures that you've taken off on Schedule C? He goes, oh, no, I throw those away. I don't have those. And I said, well, how did you come to these numbers? Here's a bank account with all of your deposits. That doesn't in any way correspond with the grocery receipts on Schedule C. He goes, I don't know. You'll have to ask my accountant. He said that probably four or five times in the morning session. And so after the fourth or fifth time I asked him, I said, well, who's your accountant? And he goes, well, I don't think that's relevant. But I did it all by TurboTax myself. So in the first day of trial, we've been told, first of all, that we have several bank accounts that have never been shown before. Then we're told the bank statements are accurate. All we have to do is ask his accountant. And then later on in the afternoon, we're told, oh, I did these myself on TurboTax. And I said, well, do you have anything to back up any of these tax returns? No. My bank statements have it. And so we went through my bank statement. My tax returns are correct. That's what we should use. Then the next trial we come, and he has a different theory of what we should use. And that's one of his exhibits. I think it's E or K. There's a couple of exhibits. He has an exhibit. So I take that exhibit, and I look at it, and I basically, I believe, show that that exhibit is not accurate as well. The next trial, there's a time in between. He comes in with yet another exhibit with a different reason why the amounts in there are not accurate. The seventh day of trial, he says at the end, well, actually, I think my tax returns are the best example of what should happen here. I don't often do this, but in my brief, two or three, four times, I cite his actual testimony. I'll say, what does this mean? He'll say, I don't know. I don't know. Ask someone. I don't know what that means. It's all confusing to me. I cite trial testimony back and forth to show that he said repeatedly he doesn't know what his income is. He doesn't understand these documents. He doesn't know if the tax returns should be used, or he doesn't know if his exhibit K should be used. And then, in the very end, after he said the tax returns in probably the second, third hearing, he says the tax returns aren't reliable and we've shown how Schedule C has no relation whatsoever to any of his bank statements. In the end, he says, well, I really think when I look back on it, I think that's the best way to determine my income. So, under the statute, if you look at this man presented probably four different versions of what his income was. In my brief, I cite or I show this one, this example, this example, this example, where he's given four different versions of the same thing. And I do that repeatedly because that's what he did. One day it was one thing. The next day it was another. His credibility, which I think is evident if you read the judge's order, his credibility was 100% lacking. This man had no credibility. He mixed his IOTA account with his business account. He said, oh, my secretary was real confused about how to do that. He admittedly didn't put his client's money into his IOTA account or he took money from his IOTA account out incorrectly and paid it to someone. He hired, he had an associate that worked with him. His associate, he said, did cases for him, never got a 1099, never got a W-2. The income that she allegedly made for him, he said, just went into his business account. I said, how do you know what's hers and what's yours? I don't know. He said, I don't think I kept track of that. And so basically what he's saying is the bank account, the business account has, and the IOTA account has no relation to any of my income. I basically just put it in, took it out, did what I wanted, and I don't think that I have to have receipts for my scheduled C expenses. I don't have to have proof of what's deductible and what's deductible. This is what it did. I put it into TurboTax. This is what it ended up, and this is what it should be. I don't think I've ever seen a case where it's more clear that the court or even the appellant in this case could not figure out what his income was. The court had no choice. One of the cases he cited was if you're having trouble figuring out what your income is, look at the previous order. You look at the previous order here. We have a based on the needs of the child because he refused to give the previous judge in the previous county the information that was needed. In this particular case, I believe that he is, what he has done is systematic. He wasn't bamboozled. He was very astute in that he thought if he sat back and did nothing, that because it was hard to figure out that somehow that would work in his paper, and it worked the first time in 2003, so he tried to do it again. The court, I believe, in reviewing the totality of the circumstances, understood that this, the needs of the child was the only way we could do anything fair in this case. And with regard to the needs of the child, Mr. Key never disputed that those, that the amounts that were used for the needs of the child were inaccurate. He never disputed that that was an incorrect amount. He just says she should have calculated the child support. She shouldn't have based it on the needs of the child. He never says that the needs of the child were incorrectly calculated. Thank you, counsel. Rebuttal. Thank you, Your Honor. One point that I readily admit, and that is Mr. Key does not know how to do his own taxes. And that's why I prepared exhibits K and G. I disagree with closing counsel. Those exhibits are entirely consistent with one another and consistent with his bank statements because they're a reflection of his bank statements. They go line by line, check number by check number. These are in the record? Yes, they were all in the record. Okay. Yes. So, and we used exhibit B from the start. Exhibit B is almost identical to exhibit G, but if you look at B, it's actually their exhibit. And then I hand wrote some numbers at the bottom because I wanted it all to be on one exhibit comparison. Theirs to mine. And then when the next court date came up, I put those into a different format, which was exhibit G. Essentially the same thing. Very slight modifications because one of the things the judge asked me to do was on exhibit K, go back and identify specific check numbers and dates, which I did in painstaking detail. So there is no inconsistency between B, G, and K. They keep saying that he came up with a different answer every court date, and that's simply not true. All of the exhibits are consistent with one another. G and K represent nothing but a summary of his bank account statements, which we stipulated to at the very outset of the trial. One of the things that she mentioned was that the information that he provided about all these other bank accounts. Interestingly, one was an Iota account from the state of Iowa that he never used. One was an account with his daughter that he never used. One was a personal account, and only after he took money out and paid himself out of his business account did he dump money into his personal account, which they never used. The only account that was used was his business account. That's the only one that was introduced into evidence at the trial. And that's the only one that you really have to even look at for purposes of calculating all this because all of his, true to his word, one thing that was clear, all of his deductions are in his bank account statements. You can see student loans being paid out. You can see all of the court costs and clerk fees and everything, check by check, in his bank account statements. And that's, like I said, that's what G and K represent. They said nine orders were entered by IGHFS. They're all order notices to withhold income. They're just standard kicking out order notice to withhold based on where they think he's working at any given time. There's only one administrative court date in all of Exhibit 13, which was their group exhibit that they said that IGHFS was pursuing this on behalf of the mother. And that's only one court date for August 28, 2007, which was shortly after his attorney, John Allen, had filed his citation to discover assets in March of 2007. That was only a few months after that. That's the only thing John Allen or her did to pursue this between the time of the filing of the petition in August of 2006 up until the time that they moved in here. As far as the 2003 default order that was entered against him because he failed to provide information, he filed a motion to set that aside, but then he withdrew that. The judge didn't make any finding that he had no basis or anything. He simply dismissed it and went on with that as being the order of the court about the amount of child support that he was paying. And that was when he was ordered to pay $480 a month, $400 for support plus $80 a month toward health care insurance at that point in time. But he withdrew that voluntarily. Chelsea, the woman who was working out of his office for a period of time in 2013, I believe it was, she was not an associate. She was working out of his office. He testified. She was a fresh face out of law school. He was doing her great, letting her work out of his space for free for a little while. She only did that for about six months. And that's part of what is listed in the list of court costs and other expenses that were not included as deductions. Some of them were bank errors, for example. But the court costs that was attached to exhibit K specifically listed all of the different categories by number of what each deduction should have been. Ultimately, this is an issue where there was multiple penalties for discovery. The judge got upset about the discovery. Granted, he didn't comply as quickly as he should have with respect to discovery. He was ordered in January of 2014 to provide materials. And he didn't provide them until I came into the case in September of 2014. So there was about nine, 10 months that he failed to comply with discovery. This is multiple penalties for discovery. We ask for one person. Thank you, counsel. The court will take this matter under advisement. Issue of disposition in due course.